UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO.: 11-cv-62119-Dimitrouleas/Snow

KANTI PONAMGI                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )
                                       )
SAFEGUARD SERVICES LLC,                )
                                       )
        Defendant.                     )
_____)

**DEFENDANT'S CASE-DISPOSITIVE MOTION FOR SUMMARY JUDGMENT
WITH STATEMENT OF UNDISPUTED MATERIAL FACTS
AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

Defendant, Safeguard Services, LLC ("Safeguard"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1 and 7.5 for the Southern District of Florida, hereby moves the Court for summary judgment in its favor. For the reasons set forth below, the pleadings, depositions, and affidavits demonstrate that there is no genuine issue as to any material facts, and that Safeguard is entitled to summary judgment as a matter of law.

**I.      INTRODUCTION.**

Safeguard, a subsidiary of Hewlett-Packard, contracts with the Center for Medicare and Medicaid Services ("CMS")[1] in various regions of the United States (referred to as "Zones") to investigate Medicare and Medicaid fraud by performing Medicare/Medicaid data analysis and comprehensive problem identification and research to identify potentially fraudulent Medicare providers. Plaintiff Kanti Ponamgi ("Plaintiff") was employed by Safeguard as an Insurance Specialist III, from June 1, 2006, until May 31, 2011. On October 3, 2011, Plaintiff filed a single-count Complaint, alleging a disparate pay claim pursuant to the Equal Pay Act ("EPA"), which is a portion of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 206(d) (1976). *See* Complaint (D.E. #1). Thereafter, on July 12, 2012, Plaintiff amended her Complaint to add claims for race discrimination, national origin discrimination, and gender discrimination pursuant

_____
[1] CMS administers Medicare and Medicaid for the federal government.

to Title VII of the Civil Rights Act of 1967, as amended, 42 U.S.C. §2000e *et seq*. ("Title VII"). *See* Amended Complaint (D.E. #16).  Subsequently, on October 31, 2012, Plaintiff voluntarily dismissed all of her Title VII claims (Count I-III), leaving only her EPA claim (Count IV), (D.E. #19).  Thus, Plaintiff's sole remaining claim is her EPA claim alleging that, because of her gender, she was paid less than others who held the same job title and performed the same work.

The undisputed material facts establish no basis for Plaintiff's claim.  The undisputed record evidence fails to establish that Plaintiff was lesser wages that male employees occupying a position that required equal skill, effort and responsibility. Moreover, Plaintiff does not have a shred of evidence to dispute Safeguard's position that any differential in pay was based on any other factor other than sex.  As such, the undisputed material facts fail to establish a basis for any of Plaintiff's claims, and summary judgment is warranted to Safeguard.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS.

1.      Prior to August 26, 2008, Safeguard was a subsidiary of EDS, a global technology services company.  (Declaration of Linda Webb, ¶3).[2] As of August 26, 2008, EDS and its subsidiaries were acquired by Hewlett-Packard.  (*Id.*).

2.      The Center for Medicare and Medicaid Services ("CMS"), which administers Medicare and Medicaid, contracts with Safeguard in various regions of the United States (referred to as "Zones") to investigate Medicare and Medicaid fraud by performing Medicare/Medicaid data analysis and comprehensive problem identification and research to identify potentially fraudulent Medicare providers.  (Deposition of Barbara Atlas ("Atlas Dep."), p. 7; Declaration of Barbara Atlas ("Atlas Decl."), ¶3).[3]

3.      Prior to 2008, Safeguard was responsible for operating the "Florida Benefit Integrity Support Center," and was limited to investigating fraud in Medicare Part A and B, as well as Medicaid.  (Atlas Dep., p. 7).

4.      Thereafter, on or about October 2008, Safeguard was awarded the more lucrative "Zone 7 Contract" by CMS, which increased its investigatory responsibilities across all lines of Medicare and Medicaid for Florida, Puerto Rico, and the U.S. Virgin Islands.  (Atlas Dep., p. 8).

---

[2] Ms. Webb's sworn declaration was filed under seal, *see* D.E. #25 and D.E. 27.
[3] True and correct copies of Ms. Atlas' deposition and sworn declaration are attached hereto as Exhibits 1 and 2, respectively.  Ms. Atlas' sworn declaration with her original signature was to be delivered to undersigned counsel via FedEx before the time this Motion was filed, but was not received in time due to a delay in the package's delivery.  Immediately upon receipt of Ms. Atlas' original signature, Defendant will file a copy of the same with the Court.

At that point, Safeguard became known as a "Zone Program Integrity Contractor." (Deposition of Raul Martinez) ("Martinez Dep., p. 9).[4]

5.      On June 1, 2006, Safeguard hired Plaintiff Kanti Ponamgi ("Plaintiff") as an Insurance Specialist III, working at the Florida Benefit Integrity Support Center, which is located in Miramar, Florida. (Atlas Decl., ¶4). Plaintiff is a female. (Deposition of Kanti Ponamgi ("Pl. Dep."), p. 14).[5]

6.      Insurance Specialists III, known within Safeguard as data analysts, are tasked with mining information provided by CMS to assist with investigations of Medicare and Medicaid fraud, waste and abuse. (Atlas Dep., p. 24; Atlas Decl. ¶5). This information was provided either to Safeguard's internal team of investigators or directly to law enforcement. (*Id.*). Data analysts were expected to be proactive; that is, they were expected to be able to identify potential indicators of fraud within the data, as opposed to merely running data queries requested by investigators. (Atlas Dep., p. 24-25; Atlas Decl. ¶6).

7.      Each job code within Safeguard has a coordinating salary range for new hires. (Atlas Decl., ¶7). New hires are typically brought on at about 35% of the range, *i.e.*, below the mid-point. (*Id.*). However, exceptions are made for relevant experience, education, and skills, or lack thereof. (*Id.*). Salary recommendations were made by the hiring manager and then approved by the Program Director, Barbara Atlas. (Martinez Dep., p. 18).

8.      Plaintiff's starting salary was $45,000, annually. (Pl. Dep., p. 50). Plaintiff does not know who made the decision to hire her, or who set her salary. (*Id.* at 48, 50). Furthermore, Plaintiff lacks knowledge of what factors were considered in setting her salary, and does not know the salary range for her position. (*Id.* at 52).

9.      To be sure, Insurance Specialists III were paid at varying salaries within the established salary range for the position. (Atlas Decl., ¶7). Insurance Specialists IIIs salaries were based on their skills and experience at the time of hire. (*Id.*). Prior experience as a data analyst in the Medicare and Medicaid field, particularly with respect to the identification of fraud, waste and abuse, is very important to Safeguard. *(Id.)*. It is difficult, if not impossible, to identify potential fraud indicators, such as a spike in a certain type of claims with high reimbursement rates from a single practitioner, without prior experience. (*Id.*).

---

[4] A true and correct copy of Mr. Martinez' deposition is attached hereto as Exhibit 3.
[5] A true and correct copy of Plaintiff's deposition (Volumes I and II) is attached hereto as Exhibit 4.

10.     Notably, Plaintiff was unemployed for seven years before applying to Safeguard. (Pl. Dep., p. 24).  Her most recent position (seven years earlier) was as a part-time assistant to the director of the nursing program at Thomas Edison College.  (*Id*. at 26).  Prior to that position, from November 1991 to December 1996, she worked for an electronic health insurance claim service performing electronic claims submissions and doing some software development.  (*Id*. at 31, 34).  From January to October 1990, she worked as a part-time data analyst at a hospital compiling regulatory submissions.  (*Id*. at. 37-38, 40).

11.     In other words, Plaintiff possessed only a couple of years' experience in medical billing, once worked a data analyst for nine months, and never worked as a data analyst mining for indicators of Medicare and Medicaid fraud, abuse and waste.  (*See* Pl. Dep., p. 31, 34, 37-38, 40, 44).  All of this was taken into account in setting her starting salary within the range applicable at the time of her hire.  (Atlas Decl., ¶11).  Nobody on the data team had as little prior experience as Plaintiff did at the time of her hire.  (*Id*.).

12.     On July 1, 2007, Plaintiff received a $5,000 raise, bringing her annual salary up to $50,000.  (Pl. Dep., p. 61).

13.     From 2007 forward, Safeguard possessed extremely limited funds to award employees salary increases.  (Atlas Decl., ¶8).  Those monies that were available were awarded as discretionary merit increases to top performers who surpassed expectations.  (*Id*.).

14.     Plaintiff received "Achieves Expectations" ratings on her 2007 and 2008 Performance Evaluations, which is an average performance rating. (Atlas Dep., p. 28; Pl. Dep., p. 92-97, Pl. Dep. Ex. 9).  As a result of these mediocre ratings, Plaintiff was not awarded any discretionary salary increases.  (Atlas Decl., ¶9).

15.     On February 18, 2009, Hewlett-Packard, Safeguard's parent company, announced that employees' compensation would be reduced, across the board, as a result of the global recessions and as a means to avoid mass lay-offs.  (Pl. Dep., p. 64, 67, Pl. Dep., Ex. 5).  The salaries of all exempt employees were reduced by 5%.  (*Id*.).

16.     As a result, in March 2009, Plaintiff's annual salary was reduced to $47,500.  (Pl. Dep., p. 63, 67).  Significantly, this salary reduction impacted *all* employees across Hewlett-Packard, and not just Plaintiff.  (*Id*. at p. 64).

17.     Although Plaintiff's salary was reduced in 2009, she received a $2,500 bonus that year and thus, experienced no overall decrease in her compensation.  (Webb Decl., ¶4).

4

18.     Once Safeguard was awarded the Zone 7 Contract in the fall of 2008, the amount of work, responsibility and time pressure increased for the Zone 7 Data Team.  (Atlas Decl., ¶10).  At some point after that, it became obvious to management that Plaintiff did not have the requisite skills to perform the job to Safeguard's expectations, and that she was resistant to receiving any type of feedback to improve her skill level (Atlas Dep., p. 14).  Eventually, it became enough of an issue that Program Director Barbara Atlas, Program Manager Raul Martinez and Data Manager Chris Anghelescu met to discuss whether there were any projects in which Plaintiff could be successful because they believed that she was not keeping up with the other data analysts on the Data Team.  (Atlas Dep., p. 13-14).

19.     For example, Plaintiff's supervisors determined that she was incapable of performing any proactive data analysis.  (Atlas Dep., p. 30).  As a result, Plaintiff's primary responsibility was testing the data download that was provided by CMS.  (Deposition of Anselmo Alliegro ("Alliegro Dep."), p. 12;[6] Pl. Dep., p. 56).  This merely required her to review the data to ensure that it downloaded correctly prior to releasing it to the data team for mining.  (*Id*. at 12-13).

20.     Additionally, Plaintiff would be asked to simply check other analysts work for quality, as opposed to being tasked to run her own proactive searches.  (Declaration of Chris Anghelescu ("Anghelescu Decl."), ¶3).[7]

21.     Moreover, Plaintiff was assigned several projects, but her supervisor was unhappy with her performance on these projects because they did not yield any results.  (Anghelescu Decl., ¶4).

22.     Further, despite her limited responsibilities, Plaintiff complained about her workload.  (Alliegro Dep., p. 13).  However, when her workload was reviewed, her complaints were found to be frivolous.  (*Id*. at 13-14).

23.     Plaintiff's supervisors also determined that she had difficulty communicating with others, because her tangential thoughts and lack of subject matter knowledge made her difficult to understand.  (Atlas Dep., p. 29-30; Deposition of Chris Anghelescu ("Anghelescu Dep."), p.

---

[6] A true and correct copy of Mr. Alliegro's deposition is attached hereto as Exhibit 5.
[7] A true and correct copy of Mr. Anghelescu's declaration is attached hereto as Exhibit 6.

21).[8]  As a result, multiple investigators told Plaintiff's supervisors that they did not want their projects assigned to Plaintiff.  (Atlas Dep., p. 29; Anghelescu Dep., p. 21-22).

24.    Plaintiff received a "P" (Achieves Expectations") rating on her 2009 Performance Evaluation, which outlined specific areas for improvement, including her communication skills, time management, and ability to prioritize.  (Anghelescu Decl., ¶5; Pl. Dep., Ex. 11).

25.    Despite the feedback, Plaintiff's performance failed to improve.  (Anghelescu Decl., ¶6).  As a result, her manager at the time, Data Manager Chris Anghelescu, gave her a "P-" rating (Development Needed to Achieve Expectations) on her 2010 performance evaluation, which rated the period from November 1, 2009 to October 31, 2010.  (*Id.*; Pl. Dep., p. 102-103, Ex. 12).  Plaintiff was not the only Insurance Specialist III to receive a P- rating from Mr. Anghelescu on the 2010 evaluation.  (*See* Webb Decl., ¶6).  In addition to Plaintiff, he gave a P- to two other individuals, both of whom are male.  (*Id.*).

26.    On November 22, 2010, Hewlett Packard announced its results for the 2010 fiscal year.  (Pl. Dep., p. 73; Pl. Dep. Ex. 17).  Based on impressive performance, Hewlett Packard announced that for those employees active as of February 1, 2011, and whose most recent performance rating was a "P" or higher, salaries would be brought back to pre-reduction levels.  (Pl. Dep. Ex. 17, Pl. Dep., p. 213-14).

27.    Because Plaintiff received a "P-" rating on her most recent performance rating, her salary reduction was not restored.  (Anghelescu Decl., ¶7).  The conditions to the salary restoration were not announced until after annual performance evaluations had been completed.  (*Id.*; Atlas Decl., ¶10).  Thus, at the time he issued Plaintiff's 2010 evaluation, Mr. Anghelescu was unaware that a P- rating would preclude her from receiving her salary restoration.  (Anghelescu Decl., ¶7).

28.    Plaintiff's annual salary remained at $47,500 until the end of her employment.  (Pl. Dep., p. 75).  Plaintiff voluntarily resigned on May 31, 2011.  (Anghelescu Dep., p. 29-30; Pl. Dep., p. 67-68, Pl. Dep. Ex. 6).

29.    Plaintiff has no personal knowledge of the salaries of her peers, who decided their salaries, or what factors were considered in setting those salaries.  (Pl. Dep., p. 152-166, 201).

30.    Notwithstanding her lack of any evidence of disparate pay other than her "estimates" of other Insurance Specialist IIIs' salaries, Plaintiff commenced this lawsuit, alleging

---

[8] A true and correct copy of Mr. Anghelescu's deposition is attached hereto as Exhibit 7.

that she was paid less than male employees performing the same work.  *See generally*, Plaintiff's Amended Complaint.  [D.E. #16].

     31.    The annual salaries of the Insurance Specialists IIIs on the Zone 7 Data team for 2009-2011 were:

| Name | Date of Hire | Gender | Salary 2009 | 2009 Performance Rating | Salary (2010) | 2010 Performance Rating | Salary (2011) |
|---|---|---|---|---|---|---|---|
| M.S. [9] | 12/18/06 | F | $64,600.00 | P | $64,600.00 | N/A | N/A |
| S.P. | 3/1/2010 | M | $64,399.920 | N (New to Job) | $64,399.920 | P | $64,399.920 |
| C.C. | 12/1/2009 | M | $60,000.00 | N | $60,000.00 | P- | $60,000.00 |
| G.H. | 11/16/2009 | M | $60,000.00 | N | $60,000.00 | P | $60,000.00 |
| M.F. | 1/19/2010 | M | $60,000.00 | N | $60,000.00 | P+ | $61,200.00 |
| N.O. | 1/11/2010 | M | $57,999.960 | N | $57,999.960 | P | $57,999.960 |
| A.H. | 1/11/2010 | M | $57,999.960 | N | $57,999.960 | P+ | $57,999.960 |
| U.H. | 10/1/2009 | M | $57,500.00 | N | $57,500.00 | P- | $57,500.00 |
| L.L. | 10/1/2009 | F | $56,060.00 | N | $56,060.00 | P | $56,160.00 |
| V.H. | 4/19/2010 | M | $55,000.00 | N | $55,000.00 | P | $55,000.00 |
| P.G. | 1/11/2010 | F | $54,999.960 | N | $54,999.960 | P | $54,999.960 |
| S.M. | 3/30/1998 | F | N/A [10] | P | $54,869.530 | P | $57,757.400 |
| V.P. | 7/24/2006 | F | $52,500.00 | P+ | $52,915.00 | P+ | N/A |
| V.L. | 11/16/2009 | F | $51,966.00 | N | $51,966.00 | P | $52,996.00 |
| S.A. | 10/1/2009 | F | $50,000.00 | N | $50,000.00 | N/A [11] | $50,000 |
| C.H. | 2/2/2009 | M | $50,000.00 | P | $50,000.00 | P | $50,000.00 |
| Plaintiff | 6/1/2006 | F | $47,500.00 | P | $47,500.00 | P- | $47,500.00 |
| M.D. | 12/15/2008 | F | $47,500.00 | P | $47,500.00 | P | $51,000.00 |
| J.R. | 9/5/2000 | M | $39,840.60 | P- | $39,840.60 | N/A | N/A |

(Webb Decl., ¶6). [12]

---

[9] M.S. was promoted to Insurance Specialist IV on April 30, 2010.
[10] S.M. transferred from another position to an Insurance Specialist III on June 16, 2010.
[11] S.A.  resigned on March 5, 2010.

32.     Plaintiff was not the lowest paid Insurance Specialist III.  In fact, the lowest paid person, J.R. (male), was paid substantially less than Plaintiff.  (Webb Decl., ¶7).  Furthermore, there were many females paid more than Plaintiff and more than several male counterparts.  (*Id.*).  Notably, the highest-paid Insurance Specialist III was a female: M.S.  (*Id.*).

33.     Safeguard has a policy that prohibits discrimination based on any protected characteristic with respect to any employment decisions.  (Pl. Dep., p. 136-137, Ex. 14).  Gender plays no role in setting salaries at Safeguard.  (Atlas Decl., ¶11).  Instead, only neutral factors, such as experience and skills are considered.  (*Id.*).  Notably, *no one* on the data team had as little prior experience with Medicare and Medicaid fraud and abuse than Plaintiff did, and no one had been out of the workforce for as long as Plaintiff had, seven years.  (*Id.*).

34.     Furthermore, all of the other members of the Data Team performed a broader array of responsibilities than Plaintiff, who was limited to data testing and quality control and who could not work effectively with the teams of investigators who were the data team's business partners.  (Anghelescu Decl., ¶8).  Thus, although the generic written job description for the Insurance Specialist IIIs was the same, the actual duties being performed varied substantially based on experience, skills and ability.  (Martinez Dep., p. 13; Atlas Decl. ¶12, Anghelescu Decl., ¶8).

35.     For example, S.P. was part of the team that responded to law enforcement requests and he proactively created his own research databases from scratch.  (Anghelescu, ¶9).  Similarly, A.H. and U.H. were part of the law enforcement request for information team.  (Anghelescu, ¶9).  Because this information is being relied upon in criminal and civil prosecutions, it is imperative that it be accurate.  (Anghelescu, ¶9).  Further, these data analysts may be called to testify to support the chain of custody of the evidence.  (Anghelescu, ¶9).  In contrast, Plaintiff's manager had no confidence that Plaintiff's results would stand up in a court of law.  (Anghelescu, ¶9).

36.      M.F. was previously employed by Safeguard in another Zone and came highly recommended.  (Anghelescu, ¶10).  During his employment, he was one of the highest-rated

---

[12] The identities of Plaintiff's alleged comparators are being withheld to protect the employees' confidentiality with respect to their compensation and performance ratings.  A full and complete copy of Ms. Webb's sworn declaration, which provides the full name of each individual, was filed under seal pursuant to the Court's Order dated November, 5, 2012 [D.E. #27].

analysts on the team and was primarily responsible for detecting fraud in the home healthcare industry. (*Id.*).

37.     G.H. supported an entire team of investigators with little oversight or supervision. (Anghelescu, ¶11).

38.     V.H. was solely responsible for supporting the Medicare Fraud hotline, which is comprised of 20 investigators. (Anghelescu, ¶12). C.H. was capable of performing proactive work to identify potential indicators of fraud and developed his own project that identified fraudulent Medicare suppliers (and he presented his project at a conference and received the highest rating of all the presentations given). (*Id.*).

39.     The remaining employees on the Data Team all possessed greater experience and technical skills than Plaintiff and, as a result, were capable of independently and proactively conducting data analysis. (Anghelescu, ¶13). Notably, none of the members of the Data Team were similarly limited to solely conducting data testing and quality control work, as was Plaintiff. (*Id.*).

40.     Plaintiff concedes that responding to law enforcement requests and proactive data analysis was a critical part of the job. (Pl. Dep., p. 54).

41.     The majority of the data team was hired *after* the salary reduction occurred and after Safeguard was awarded the Zone 7 contract. (Atlas Decl., ¶12). While the salaries of individuals employed in February 2009 remained frozen, the Company hired new personnel at rates intended to be more competitive in the marketplace, which created a disparity, whereby newly hired staff were paid more than most staff who been with the Company for longer periods of time. (*Id.*, Ex. 1).

42.     Safeguard recognized that as a result of wage freezes and roll-backs, its salaries had not kept pace with the market. (Atlas Decl., ¶13; Pl. Dep., Ex.16). Notably, this was a factor that affected all Safeguard employees hired before the Hewlett-Packard acquisition, male and female alike. (Atlas Decl., ¶13; Pl. Dep., p. 208-209).

43.     However, to meet its obligation under the Zone 7 contract, Safeguard had to attract talent and hire qualified individuals. (Atlas Decl., ¶14). Both because the Zone 7 contract was a more lucrative contract and because of market conditions, Safeguard was able to bring highly qualified applicants onboard at higher salaries than it did previously. (Atlas Decl., ¶14).

Notably, no existing employees, regardless of protected classification, were given raises to "match" their salaries to the newly hired individuals. (*Id*.).

44.     Plaintiff never complained of discrimination during her employment. (Pl. Dep., p. 137). Moreover, Plaintiff never complained that she was paid less than any of her peers during her employment with Safeguard. (Anghelescu Dep., p. 24). The *only* time she complained during her employment about anything relating to her pay was in November of 2010, when she realized her salary would not be restored as a result of her P- performance rating. (*Id*. at 25).

45.     Furthermore, Plaintiff admits that no one made any derogatory comments to her about her gender. (Pl. Dep., p. 153-154).

46.     The only comparators that Plaintiff could offer in response to Defendant's First Set of Interrogatories were S.P., Terry Winn, and Porfirio German. (Pl. Dep., Ex. 1; *see also* Pl. Dep., p. 200). However, Plaintiff admits that the higher salaries she claimed they earned were just "estimates." (Pl. Dep., p. 152, 159). Moreover, Mr. Winn and Mr. German held a different position than Plaintiff, Insurance Specialist IV, and they performed substantially more sophisticated duties with much more responsibilities than Plaintiff. (Anghelescu Decl., ¶15). In particular, they were responsible for proactively targeting fraud, waste and abuse. (*Id*.). Although S.P. was an Insurance Specialist III like Plaintiff, he had greater technical skills and thus, was able to proactively analyze data. (*Id*.). Moreover, each came to Safeguard with more relevant skills and knowledge directly related to Safeguard's field than did Plaintiff. (*Id*. at ¶15).

47.     Plaintiff admits that she has no knowledge of their prior experience, work history, or performance evaluations. (Pl. Dep., p. 161-162). Moreover, all three were hired *after* the salary freezes took effect and *after* the Zone 7 contract was awarded, which is significant for the reasons set forth, *supra* in Paragraph 41-43. (*See* Pl. Dep., p. 158).

48.     Plaintiff candidly admits that she has no knowledge as to *anyone's* prior experience, no knowledge of precisely when others were hired, no knowledge of who made decisions relating to setting the compensation of others, and no knowledge as to what factors were deemed significant in setting compensation. (Pl. Dep., p. 160-162, 166-188, 201).

49.     After Safeguard served its discovery responses, Plaintiff increased her list of alleged comparators to include nearly every male listed in the chart above, except for the one male who earned *less* than she did. However, Plaintiff admits that she merely "thinks" these individuals were paid more, and has no proof. (Pl. Dep., p. 166). Moreover, Plaintiff does not

know their prior experience, work history or daily job duties, and does not know who hired them, who set their salary, and what factors their compensation was based on.  (Pl. Dep., p. 166-188).

### III.   SUMMARY JUDGMENT STANDARD.

The U.S. Supreme Court unequivocally endorses the right of a trial judge to grant summary judgment.  *Celotex v. Catrett*, 477 U.S. 317 (1986).  Summary judgment is appropriate if it appears through pleadings, depositions, and affidavits that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex*, 477 U.S. at 322 (1986); *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308 (11th Cir. 1994).  The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion and the absence of a genuine issue of material fact.  *Armstrong*, 33 F.3d at 1309 (internal citations omitted).  If this initial burden is met, the burden shifts to the non-moving party to establish that genuine issues of material fact exist.  *Id.*

A plaintiff cannot defeat a motion for summary judgment by resting upon conclusory allegations in the pleadings.  Fed.R.Civ.P. 56 (e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be defeated merely on the basis of "metaphysical doubt" about material facts or on the basis of "conjecture or surmise."  *Matsuhita Elec. Indus. Cp. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  Instead, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e), *Matshuita*, 475 U.S. at 587.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party is "merely colorable, or is not significantly probative, then summary judgment may be granted."  *Anderson*, 477 U.S. 242, 249-50.

### IV.   SUMMARY JUDGMENT IS PROPER AS TO PLAINTIFF'S EQUAL PAY ACT CLAIM.

The Equal Pay Act ("EPA") provides, in relevant part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to

> (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).  By choosing to use the term "equal work" instead of "comparable work," Congress manifested its intent to narrow the applicability of the Act, and permit employers discretion in setting pay.  *Major v. Green Thumb Landscaping, Inc.,* 2005 U.S. Dist. LEXIS 33963 (M.D. Fla. Apr. 13, 2005) (citing *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989)).

### A.    Plaintiff Cannot Establish A *Prima Facie* Case

To establish a *prima facie* case under the Equal Pay Act of 1963, a plaintiff "must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'"  *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S. Ct. 2223, 2228, 41 L. Ed. 2d 1 (1974) (quoting 29 U.S.C. § 206 U.S.C.A. 206(d)(1)).  Once a plaintiff makes out a *prima facie* case, the burden shifts to the employer to prove that the difference in pay is justified by one of the four exceptions in the Equal Pay Act: "(i) a seniority system: (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production: or (iv) a differential based on any other factor other than sex."  *Corning Glass Works*, 417 U.S. at 196, 94 S. Ct. at 2229 (quoting 29 U.S.C. § 206(d)(1)).

As a preliminary matter, Plaintiff cannot show that Safeguard pays different wages to employees of opposite sexes.   Significantly, a *male* Insurance Specialist III was paid substantially less than Plaintiff, earning $39,840.60 on an annual basis.  Further, as set forth in Paragraph 31 above, numerous females earned more than Plaintiff and other male colleagues.  Indeed, the *highest* paid Insurance Specialist III was a female, M.S., who earned a salary of $64,600.  Thus, Plaintiff has failed to show that her employer pays different wages to employees of opposite sexes.  *Okazaki v. Dep't of Children & Families*, 2008 U.S. Dist. LEXIS 77702, 19-20 (N.D. Fla. Oct. 3, 2008)(noting that the plaintiff failed to establish that her employer paid different wages to employees of opposite sexes in part because the defendant presented evidence of male comparators whose wages are similar to or less than the plaintiff's wages).

Moreover, more than just salary information is needed to ascertain whether the employees depicted on the table set forth in Paragraph 31 of Defendant's Statement of

Undisputed Material Facts are substantially equal comparators to Plaintiff.  "The controlling factor under the Equal Pay Act is job content--the actual duties the respective employees are called upon to perform." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799-800 (11th Cir. 1989)(citation omitted); *see also Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1049 (5th Cir.), cert. denied, 414 U.S. 822, 94 S. Ct. 121, 38 L. Ed. 2d 55 (1973)(holding that job titles are not determinative, rather, the controlling factor under the Equal Pay Act is job content -- the actual duties that the respective employees are called upon to perform.).

While each Insurance Analyst III had the same generic written job description, they performed *substantially* different duties within that job code based on skill set, experience, and abilities.  (Statement of Undisputed Material Facts, *supra* Section II, at ¶34).  For example, Plaintiff's supervisors felt that she was incapable of performing any proactive data analysis, which was one of the primary functions that data analysts performed.  (*Id.* at ¶19).  As a result, Plaintiff's primary responsibility was testing the data download that was provided by CMS. (*Id.*).  This merely required her to review the data to ensure that it downloaded correctly prior to releasing it to the data team for mining.  (*Id.*).  Additionally, Plaintiff would be asked to simply check other analysts work for quality, as opposed to being tasked to run her own proactive searches.  (*Id.* at ¶20).  Moreover, Plaintiff was assigned several projects, but her supervisors were unhappy with her performance because they never yielded any concrete results.  (*Id.* at ¶12).  Further, despite her limited responsibilities, Plaintiff complained about her workload.  (*Id.* at ¶22).  However, when her workload was reviewed, her complaints were found to be frivolous. (*Id.*).  Lastly, Plaintiff's supervisors determined that she had difficulty communicating with others, because her tangential thoughts and lack of subject matter knowledge made her difficult to understand.  (*Id.*).  In fact, multiple investigators told Plaintiff's supervisors that they did not want their projects assigned to Plaintiff.   (*Id.*).

The duties and responsibilities of other individuals who held the same job title as Plaintiff (Insurance Specialist III) were incomparable to Plaintiff's duties and responsibilities, given the technical ability and level of responsibility held.  (*Id.* at ¶34).  For example, S.P. (male) was part of the team that responded to law enforcement requests and he proactively created his own research databases from scratch.  (*Id.* at ¶35).  Similarly, A.H. and U.H. (both males) were part of the law enforcement request for information team.  (*Id.*).  Because this information is being relied upon in criminal and civil prosecutions, it is imperative that it be accurate.  (*Id.*).  Further,

these data analysts may be called to testify to support the chain of custody of the evidence.  (*Id.*).

In contrast, Plaintiff's manager had no confidence that Plaintiff's results would stand up in a court of law.  (*Id.*).

M.F. (male) was previously employed by Safeguard in another Zone and came highly recommended; during his employment, he was one of the highest-rated team and was primarily responsible for detecting fraud in the home healthcare industry.  (*Id.* at ¶36).  G.H. (male) supported an entire team of investigators with little oversight or supervision.  (*Id.* at ¶37).  V.H. (male) was solely responsible for supporting the Medicare Fraud hotline, which is comprised of 20 investigators.  (*Id.* at ¶38).  C.H. (male) was capable of performing proactive work to identify potential indicators of fraud and developed his own project that identified fraudulent Medicare suppliers (and presented his project at a conference and received the highest rating of all the presentations given).  (*Id.*).

Plaintiff claims that Mr. Winn (male) and Mr. German (male) are also relevant comparators.  However, they held a different position than Plaintiff, Insurance Specialist IV, and they performed substantially more sophisticated duties with much more responsibilities that Plaintiff.  (*Id.* at ¶46).  In particular, Mr. Winn and Mr. German were both responsible for proactively targeting fraud, waste and abuse.  (*Id.*).

Although it was hoped that Plaintiff would be able to perform the full range of duties as an Insurance Specialist III, and that her skills would progress, it became immediately clear that Plaintiff was incapable of proactively identifying indicators of fraud.  (*Id.* at ¶19).  For example, Plaintiff was assigned several projects, but her supervisor was unhappy with her performance on these projects because they never yielded any results.  (*Id.* at ¶21).  Plaintiff's inability to be trusted to perform proactive data analysis is significant because Safeguard's business purpose was to identify fraud and waste in Medicare and Medicare for the government.  As a result, Plaintiff was tasked with performing the monthly data download and conducting quality checks on other analysts' work.  (*Id.* at ¶19, 20).  Indeed, Program Director Barbara Atlas, Program Manager Raul Martinez and Data Manager Chris Anghelescu met to discuss whether there were any projects in which Plaintiff could be successful because she was not keeping up with the other data analysts on the Data Team.  (*Id.* at ¶18).  Unlike her more skilled and experienced colleagues, Plaintiff did not provide information to law enforcement to be used in the prosecution of Medicare and Medicaid fraud, abuse and waste, which several of her higher-paid

colleagues did.   Moreover, Plaintiff was not tasked with independently supporting a team of investigators.  To the contrary, Plaintiff was incapable of clearly communicating her thoughts to other analysts and investigators, which was essential.   (*Id*. at ¶23).   Indeed, no Insurance Specialist III performed as limited duties as Plaintiff did.   (*Id*. at ¶¶34, 39).   Thus, she cannot raise a genuine factual issue as to whether her job responsibilities were substantially similar to those select male Insurance Specialist IIIs who were paid more.

### B.     Any Pay Differential Was Based On Factors Other Than Sex.

Once a plaintiff makes out a *prima facie* case, the burden of proof shifts to the employer to prove the pay difference is justified by one of the four exceptions in the Equal Pay Act: "(i) seniority; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Corning*, 417 U.S. at 196.  A defendant must show that the factor of sex provided no part of the basis for the wage differential.  *Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1036 (11th Cir. 1985); 29 U.S.C. § 800.142.  Thus, unlike a Title VII action, if the plaintiff establishes a *prima facie* case, then the burden of proof and production shifts to the employer and the exceptions are affirmative defenses of which the employer bears the burden of proof. *See Okazaki v. Dep't of Children & Families,* 2008 U.S. Dist. LEXIS 77702 (N.D. Fla. Oct. 3, 2008).  The undisputed evidence overwhelmingly establishes that any pay differentials were based on factors other than sex.

Plaintiff was offered a salary that was consistent with her skills and experience, or lack thereof.  (Statement of Undisputed Material Facts, *supra* Section II, at ¶11).  At the time of Plaintiff's hire, she had very little relevant experience and had been unemployed for *seven* years.  (*Id.* at ¶10).  Thus, she was hired at a salary of $45,000, which was within the range of salaries offered for that position.  (*Id.* at ¶8-11).  The following year, Plaintiff received a raise of $5,000, bringing her salary up to $50,000.  (*Id.* at ¶12).  Due to budget restrictions and mediocre performance reviews, Plaintiff did not receive any other raises.  (*Id.* at ¶13).  Further, as a result of the global recession, Hewlett-Packard (Safeguard's parent company) announced that the compensation of *all* employees of the Company would be reduced in an effort to control costs and avoid mass layoffs.  (*Id.* at ¶15).  The amount of the salary reduction for all exempt employees was 5%.  (*Id.*).  Accordingly, in March 2009, Plaintiff's salary was reduced by 5%, as

was the salary of every other exempt employee of Hewlett-Packard.[13]   (*Id.* at ¶16).

In Fall 2008, Safeguard was awarded a more lucrative contract from the Center for Medicare and Medicaid Services and with that came increased responsibilities.  (*Id.* at ¶4).  To meet its obligation under the Zone 7 contract, Safeguard had to attract talent and hire qualified individuals.   (*Id.* at ¶43).  Both because the Zone 7 contract was a more lucrative contract and because of market conditions, Safeguard was able to bring highly qualified applicants onboard at higher salaries than it did previously.  (*Id*). Notably, *no* existing employees, regardless of gender, were given raises to "match" their salaries to the newly hired individuals.  (*Id*).  Indeed, Safeguard was well-aware that the above-factors combined to result in a disparity whereby newly hired staff were paid more than most individuals who had been with the Company for longer periods of time (*i.e.*, those impacted by the salary reduction and freeze).  (*Id.* at ¶44).  This was a factor that affected *all* Safeguard employees hired before the Hewlett-Packard acquisition, male and female alike.  (*Id.*).

In addition to a differing economic reality that existed for individuals hired in 2009 and 2010, the other members of the Data Team had greater technical skill and experience, and were capable of performing a broader range of functions, including proactive data analysis and responding to requests for law enforcement, and they were compensated for these greater skills and responsibilities accordingly.  (*Id.* at ¶¶34-41).  In contrast, however, Plaintiff's skill set was limited to performing data testing and quality control work.  (*Id.* at ¶¶18-23).  Indeed, she never presented a single proactive data analysis, and because of her tangential thoughts and lack of subject matter knowledge, Safeguard's investigators did not want her assigned to projects.  (*Id.*).

Improved performance led Hewlett Packard to announce in last November 2010 that salaries of employees impacted by the March 2009 pay reduction/freeze could be brought back up to the pre-reduction levels.  (*Id.* at ¶26).  However, an employee had to have received an overall rating on their 2010 evaluation of "P" or higher.  (*Id.*)  Plaintiff was not eligible to receive a raise back up to her pre-reduction/freeze salary of $50,000, because she received a rating of "P-" on her 2010 evaluation.  (*Id.* at ¶¶25, 27).  Plaintiff's supervisor completed the performance evaluation before the November 2010 announcement, so he did not know at the

---

[13] Six individuals listed on the chart in ¶31 of the Statement of Facts had their salaries reduced and frozen as a result of the Company-wide reduction/freeze, including, Plaintiff, M.S., S.M., V.P., M.D., and J.R. (the rest of the individuals on the chart were not subjected to the reduction/freeze because of their hire dates).  The only male in this group was J.R., who had the lowest salary.  Thus, *every* female in this group earned more than the male.

time that the rating would preclude Plaintiff from receiving a salary restoration.  (*Id.* at ¶27).  He gave a "P-" rating to two other Insurance Specialist IIIs, both of whom were male.  (*Id.* at ¶25).  If Plaintiff had been eligible to receive the raise back up to $50,000, her salary would have then been the same as C.H., who is male.

Plaintiff has absolutely no evidence to establish that any difference in compensation was based on sex.  Instead, she relies solely on the range of compensation paid to Insurance Specialist IIIs, and hopes that the mere existence of any male employees earning more than she did, regardless of the reason why, will be sufficient for her to prevail.  However, as clearly set forth above, the differential between Plaintiff's pay and those of her higher-paid male peers was based on a combination of all of the following factors, none of which have anything to do with gender:

- Plaintiff's lack of relevant experience at the time of hire, as well as her significant length of unemployment prior to her hire;

- The unavailability of discretionary funds to award Plaintiff raises after 2007;

- The company-wide 5% reduction in salaries, which lowered Plaintiff's salary from $50,000 annually to $47,500 annually, and kept her salary frozen thereafter (until the Company lifted the freeze for employees impacted by it);

- Plaintiff's 2010 "P-" Performance Rating, which rendered her ineligible to have her 5% salary reduction restored in February 2011;

- Increased demand due to the expansion of Safeguard's responsibilities under its contract with the government and changes in market conditions which required Safeguard to hire additional Insurance Specialist IIIs in 2009 and 2010 and to bring them on at slightly higher salaries to account for market conditions and the need to attract qualified talent;

- That the more recently-hired males had greater experience and skills, thereby justifying their higher salaries; and

- That the male employees held a greater degree of responsibility, including performing proactive fraud mitigation work and liaising with law enforcement.

*None* of these factors are based on sex and are thus sufficient to sustain Safeguard's burden to show that the salary disparity did not result from sex discrimination. *See Wu v. Thomas*, 847 F.2d 1480, 1485 (11th Cir. 1988) (administrative duties, service to university and participation in Honors program are legitimate factors other than sex that can account for a pay differential); *Schwartz v. Florida Bd. of Regents*, 954 F.2d 620, 623-624 (11th Cir. 1991)("So

long as subjective business justifications, not part of a merit system, are not overly subjective so as to render them incapable of being rebutted, they are legitimate factors to be considered."); *Fowler v. Blue Bell, Inc*., 737 F.2d 1007, 1011 (11th Cir.1984) (subjective business justifications that are capable of objective evaluation are sufficient to sustain defendant's burden of rebuttal in Title VII case); *Irby v. Bittick*, 44 F.3d 949, 955-56 (11th Cir. 1995)(experience is a gender-neutral factor and legitimate business reasons for a salary differential); *Slattery v. Precision Response Corp.,* 167 Fed. Appx. 139, 143 (11th Cir. Fla. 2006)(supervising more employees, performing additional, significant duties, and managing more accounts requires greater skill, effort, and responsibility).   Furthermore, a pay differential resulting from market forces is legitimate under the EPA's exception for pay differentials resulting from factors other than sex. *Horner v. Mary Institute*, 613 F.2d 706, 714 (8th Cir. 1980); *Ottaviani v. State University of New York*, 679 F. Supp. 288, 338 (S.D.N.Y. 1988); *Kent v. Papert Cos*., 309 A.D.2d 234, 244 (N.Y. App. Div. 1st Dep't 2003)("PCI was well within its rights in considering the marketplace value of Picano's skills when determining his salary.")(citations omitted).

In sum, Plaintiff is not doing anything here but attempting to second-guess Safeguard's business judgment with respect to the legitimate non-discriminatory reasons it had for any wage differentials.   However, "fairness" is not an issue for Plaintiff to litigate or for this Court to decide.   *Murray v. World Sav. Bank*, 215 F. Supp. 2d 1316, 1320-1321 (S.D. Fla. 2002) ("Whether paying persons with such experience more than someone without such experience is fair is also not for this Court to decide. The Court concludes that it is a legitimate, non-discriminatory reason to make such wage differentials.").   There is simply no evidence in this matter to support a conclusion that the Equal Pay Act has been violated.   Accordingly, summary judgment is proper.

## V.   CONCLUSION.

WHEREFORE, based on the foregoing, Safeguard respectfully moves the Court for an order granting summary judgment in its favor, dismissing Plaintiff's claims with prejudice, and granting all other relief deemed just and proper.

DATED this 9th day of November, 2012.

Respectfully submitted,

LITTLER MENDELSON, P.C.
One Biscayne Tower, Suite 1500
Two South Biscayne Blvd.
Miami, Florida  33131
Tel:  (305) 400-7500
Fax: (305) 603-2552

By:   _/s/ Jessica T. Travers_
       Aaron Reed
       Florida Bar No. 557153
       E-mail: _areed@littler.com_
       Jessica T. Travers
       Florida Bar No. 0018129
       E-mail:  _jtravers@littler.com_

       Counsel for DEFENDANT

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 9th day of November, 2012,  a true and correct copy of the foregoing was electronically filed and served via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.

_/s/ Jessica T. Travers_
Jessica T. Travers

## SERVICE LIST

G. Ware Cornell, Jr., Esq.
E-mail: _ware@warecornell.com_
CORNELL & ASSOCIATES, P.A.
2645 Executive Park Drive
Weston, Florida  33331
Tel:  (954) 618-1041
Fax: (954) 944-1969

Firmwide:115936416.1 066902.1039