# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO.: 11-cv-62119-Dimitrouleas/Snow

| | |
|---|---|
| KANTI PONAMGI | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SAFEGUARD SERVICES LLC, | ) |
| | ) |
|     Defendant. | ) |
| _____ | ) |

**SWORN DECLARATION OF BARBARA ATLAS**

I, Barbara Atlas, having an address of 411 N. New River Drive, Fort Lauderdale, Florida, make the following declaration under penalty of perjury pursuant to the laws of the United States:

1.    I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge. This declaration is given voluntarily.

2.    From November 2006 until September 28, 2012, I was employed by Safeguard Services, LLC as a Program Director. In that capacity, I was responsible for managing the day-to-day operations of the Company's Miramar location. Thus, I have personal knowledge of the general duties and responsibilities of the employees working on the Zone 7 Data Team, as well as personal knowledge regarding compensation decisions made with respect to existing and newly hired employees

1

3. The Center for Medicare and Medicaid Services ("CMS"), which administers Medicare and Medicaid, contracts with Safeguard in various regions of the United States (referred to as "Zones") to investigate Medicare and Medicaid fraud by performing Medicare/Medicaid data analysis and comprehensive problem identification and research to identify potentially fraudulent Medicare providers.

4. On June 1, 2006, Safeguard hired Plaintiff Kanti Ponamgi as an Insurance Specialist III, working at the Florida Benefit Integrity Support Center, which is located in Miramar, Florida.

5. Insurance Specialists III, known within Safeguard as data analysts, are tasked with mining information provided by CMS to assist with investigations of Medicare and Medicaid fraud, waste and abuse. This information was provided either to Safeguard's internal team of investigators or directly to law enforcement. Data analysts were expected to be proactive; that is, they were expected to be able to identify potential indicators of fraud within the data, as opposed to merely running data queries requested by investigators.

6. Each job code within Safeguard has a coordinating salary range for new hires. New hires are typically brought on at about 35% of the range, *i.e.*, below the mid-point. However, exceptions are made for relevant experience, education, and skills, or lack thereof.

7. Insurance Specialists III were paid at varying salaries within the established salary range for the position. Insurance Specialists IIIs salaries were based on their skills and experience at the time of hire. Prior experience as a data analyst in the Medicare and Medicaid field, and particularly with respect to the identification of fraud, waste and abuse, is very important to Safeguard. It is difficult, if not impossible, to identify potential fraud indicators,

such as a spike in a certain type of claims with high reimbursement rates from a single practitioner, without prior experience.

8. From 2007 forward, Safeguard possessed extremely limited funds to award employees salary increases. Those monies that were available were awarded as discretionary merit increases to top performers who surpassed expectations.

9. As a result of her mediocre performance, Ms. Ponamgi was not awarded any discretionary salary increases after 2007.

10. In Fall 2008, Safeguard was awarded a more lucrative contract from the Center for Medicare and Medicaid Services and with that came increased responsibilities. Once Safeguard was awarded the Zone 7 Contract, the amount of work, responsibility and time pressure increased for the Zone 7 Data Team.

11. Safeguard has a policy that prohibits discrimination based on any protected characteristic with respect to any employment decisions. Race, gender and national origin played no role in setting salaries at Safeguard. Instead, only neutral factors, such as experience and skills were considered. Ms. Ponamgi possessed only a couple of years' experience in medical billing, once working as a data analyst for nine months. Ms. Ponamgi never worked as a data analyst mining for indicators of Medicare and Medicaid fraud, abuse and waste. All of this was taken into account in setting her starting salary within the range applicable at the time of her hire. Notably, *no one* on the data team had as little prior experience with Medicare and Medicaid fraud and abuse as Ms. Ponamgi, and no one had been out of the workforce for as long as Ms. Ponamgi had been, seven years.

12. The majority of the data team was hired after the salary reduction occurred and after Safeguard was awarded the Zone 7 contract. While the salaries of individuals employed in

February 2009 remained frozen, the Company hired new personnel at rates intended to be more competitive in the marketplace. This created a disparity, whereby newly hired staff were paid more than most staff who been with the Company for longer periods of time. (*See* Ex. 1).

13. Safeguard recognized that as a result of wage freezes and roll-backs, its salaries had not kept pace with the market. Notably, this was a factor that affected all Safeguard employees hired before the Hewlett-Packard acquisition, Asian, non-Asian, male, female, Indian and non-Indian alike.

14. However, to meet its obligation under the Zone 7 contract, Safeguard had to attract talent and hire qualified individuals. Both because the Zone 7 contract was a more lucrative contract and because of market conditions, Safeguard was able to bring highly qualified applicants onboard at higher salaries than it did previously. Notably, no existing employees, regardless of protected classification, were given raises to "match" their salaries to the newly hired individuals.

15. In my deposition, on page 26, I testified that Ms. Ponamgi was *supposed* to perform the generic job duties of an Insurance Specialist III. Had I been asked to elaborate (which I was not), I would have shared that while that is what Ms. Ponamgi was *supposed* to do, she was not in fact performing the expected job responsibilities of an Insurance Specialist III. Indeed as explained elsewhere in my deposition, Raul Martinez, Chris Anghelescu and me met to discuss whether there were any projects that Ms. Ponamgi could be assigned to that were appropriate for her skill set, as she was not fulfilling the responsibilities expected of an Insurance Specialist III. Specifically, she was not performing any proactive data analysis and was not able to communicate and work effectively with Safeguard's investigators. As a result, her

responsibilities were extremely limited and were distinct from all other data analysts in her position classification.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

DATED: November __, 2012

_____
Barbara Atlas

Firmwide:115406030.1 066902.1039